IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RNC SYSTEMS, INC., | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 08-1036 (JBS/KMW) |
| v. | : | |
| MODERN TECHNOLOGY GROUP, INC., et al., | : | **OPINION** |
| Defendants. | : | |

APPEARANCES:

Dean E. Weisgold, Esq. (argued)
1835 Market Street
Suite 1215
Philadelphia, PA 19103
    Attorney for Plaintiff RNC Systems, Inc. and Counterclaim
    Defendants Philip Franklin and Eric Campos

Kurt E. Kramer, Esq. (argued)
Michael N. Onufrak, Esq.
WHITE AND WILLIAMS
457 Haddonfield Rd.
Suite 400 Cherry Hill, NJ 08002
    Attorney for Counterclaim Defendant RNC Systems, Inc.

Joseph L. Doherty, Esq.
Richard Gallucci, Jr., Esq.
SPECTOR GADON AND ROSEN, PC
1635 Market Street
7th Floor
Philadelphia, PA 19103
    and
Oliver D. Griffin, Esq. (argued)
SPECTOR GADON AND ROSEN, PC
1000 Lenola Road
P.O. Box 1001
Moorestown, NJ 08057
    Attorneys for Defendants and Counterclaim Plaintiffs Modern
    Technologies Group, Inc. and Eric Alpert

**SIMANDLE,** Chief Judge:

## I.   INTRODUCTION

This matter is before the Court on Plaintiff RNC Systems Inc.'s motion for partial summary judgment [Docket Item 91] and Counterclaim Defendant RNC Systems Inc.'s motion for summary judgment dismissing Counterclaim Plaintiff Modern Technology Group, Inc.'s counterclaims and third party complaint [Docket Item 94.]  Opposition was filed to both motions and the court heard oral argument on February 6, 2012.

For the reasons discussed herein, the Court will grant Plaintiff RNC Systems Inc.'s motion for partial summary judgment as to the narrow legal issue of whether royalty payments were due under the parties' Licensing Agreement.  The Court will also grant in part and deny in part Counterclaim Defendant RNC Systems Inc.'s motion for summary judgment dismissing the counterclaim and third party complaint.

## II.   BACKGROUND

The instant action arises from a Technology License and Service Agreement between RNC Systems Inc. ("RNC") and Modern Technology Group, Inc.'s ("MTG") which was entered into on December 6, 2003. (Pl.'s Ex. C)(hereinafter "License Agreement"). The Licensing Agreement involves two different technology products to be used in the limousine industry: "Limo Touch" and "Multiplex System." (License Agreement 1.9)  Both technologies

2

relate to the secondary power system added by limousine builders to provide power for additional components such as TVs, refrigerators, retractable dividers, sound equipment and decorative lighting.

Prior to the Limo Touch technology and the Multiplex System, a master control panel known as Mastrcon was developed in 1993 by Charles Dickens.  (Pl.'s Ex. D, Deposition of Charles Dickens, "Dickens Dep.," at 44-45).  MTG marketed and sold Mastrcon to the limousine industry and Dickens, through his company Mastrcon, Inc., manufactured the Mastrcon units, drop-shipped them as they were sold by MTG, and was responsible for any subsequent warranty and service issues.  (Statement of Facts ¶ 9.)

In 2003, Tiffany Coach Works, Inc. ("Tiffany"), MTG's largest overall customer, was installing Mastrcon units in the limousines it manufactured. (Statement of Facts ¶ 10.)  Tiffany introduced RNC to MTG in an attempt to have the two companies partner on the design, manufacture and sale of a new technology to replace Mastrcon.  (Statement of Facts ¶ 13.)  However, RNC and MTG could not reach an agreement.  Thereafter, RNC continued to work on a design and prototype for Tiffany of a new technology. (Statement of Facts ¶ 14.)

In 2003, Tiffany provided RNC with funding to develop Limo Touch, a master control system that used new multi-layer printed circuit board technology.  (Statement of Facts ¶ 11.)  RNC

3

successfully developed the Limo Touch technology in 2003.
(Statement of Facts ¶ 11.)  Limo Touch was developed to compete
with and replace Mastrcon.  (Statement of Facts ¶ 12.)

In December 2003, RNC and MTG were able to reach a consensus
and executed the License Agreement at issue in this case.  The
License Agreement addresses two different technologies, the Limo
Touch technology discussed above and a new technology still in
development called Multiplex.  At the time of the agreement, Eric
Alpert, MTG's President, knew that Limo Touch had not yet been
tested in the field.  (Pl.'s Ex. E, Dep. of Eric Alpert, "Alpert
Dep.," at 113-114).  Alpert also knew that Multiplex, the new
master control panel technology, was not developed when the
License Agreement was executed.  (Alpert Dep. at 113.)  Despite
the intention of the parties, Multiplex was never successfully
developed by RNC.

In May, 2004, production of Limo Touch was transferred from
RNC's facilities in California to MTG's facilities in New Jersey.
(Statement of Facts ¶ 26.)  MTG continued its distribution
relationship with Mastrcon, Inc. through January 1, 2005, at
which time it entered a Corporate Assignment Buy-Out and
Employment Agreement with Mastrcon, Inc. and Charles Dickens.
(Statement of Facts ¶ 28.)  In January 2005, following MTG's buy-
out of Mastrcon, Inc., production of Mastrcon was transferred
from Mastrcon, Inc.'s facility in Virginia to MTG's facility in

New Jersey.  (Statement of Facts ¶ 30.)  Although MTG is seeking
to design a replacement system, MTG continues to manufacture and
sell Limo Touch and Mastrcon products. (Statement of Facts ¶ 33.)

During the past eight years, the parties have had regular
disputes.  (Statement of Facts ¶ 34.)  RNC filed the instant
action in February 2008.  The Amended Complaint alleges claims
for breach of contract, breach of good faith and fair dealing,
fraud, misappropriation of trade secrets, breach of fiduciary
duty, unjust enrichment, and interference with prospective
economic advantage against MTG and its President Eric Alpert.
The Amended Complaint also seeks a declaration that the License
Agreement is terminated. [Docket Item 6.]  MTG filed a
counterclaim and third party complaint.  MTG alleges
counterclaims for fraud in the inducement, breach of contract,
and unfair competition in violation of the Lanham Act against RNC
as well as fraud in the inducement and unfair competition in
violation of the Lanham Act against Philip Franklin and Eric
Campos, officers of RNC.  MTG also seeks declaratory relief that
the License Agreement remains in full force and effect. [Docket
Item 22.]

## III.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(a). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact. Fed.R.Civ.P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993). However, the Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party. Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

Where the nonmoving party bears the burden of persuasion at trial, the moving party may be entitled to summary judgment merely by showing that there is an absence of evidence to support an essential element of the nonmoving party's case. Fed.R.Civ.P. 56(c)(1)(B); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

## IV.  RNC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.  Background

RNC's motion for partial summary judgment seeks damages for MTG's failure to pay royalties on its sale of the Limo Touch product from October 2008 to the present.  RNC maintains that MTG's failure to pay royalties constitutes a breach of the License Agreement.  The License Agreement provides definitions for "Licensed Products" and "Licensed Technology."  The License

Agreement also provides a provision for the payment and calculation of royalties. The parties dispute the interpretation of these definitions and their impact on MTG's obligation to pay royalty fees to RNC. The main provisions at issue state:

4.1. Royalty Payments. In consideration of the license rights granted by RNC to MTG hereunder, MTG shall pay to RNC for Licensed Products sold in the Territory within the Field, royalties of fifteen percent (15%) of Gross Revenues during each calendar month ("Royalties") payable within seven (7) business days after the end of such calendar month.

1.9. "Licensed Products" means products, also known as "Limo Touch", that incorporate, use or employ the Licensed Technology and that the manufacture, use, sale or other disposition of which would, but for the license granted hereunder infringe the Intellectual Property Rights or Know-How in Licensed Technology. The Parties agree that Licensed Products shall be limited to the following products:
(a) The existing RNC P9600 "Limo Touch" single-controller system and all it's developed control modules; and
(b) The Multiplex Controller Product currently under development, which is deemed by the Parties to be limited in scope to: (I) The Master Control Module; (ii) The Switched-Output Slave Modules; (iii) The HV AC (Fan) Slave Modules; (iv) The Audio-Video Power Slave Modules; and (v) Associated driver and passenger compartment control panels, whether based on capacitive sensing as the existing control panels in 1.9(a) above, or the anticipated graphics touch screen control panel products.

4.3. Minimum Guarantee Royalty Payment. From the beginning of the second year in this Agreement, MTG will guarantee a payment of Royalties in the amount of at least twelve thousand five hundred dollars ($12,500) per calendar month (the "Monthly Guarantee Royalty Payment"); provided, however, MTG's obligation to guarantee a payment of the Monthly Guarantee Royalty Payment is subject to (I) RNC's obligation to repay all Advanced Royalties paid by MTG to RNC, as set forth in Subsection 4.2(c), and (ii) MTG's sale of one thousand (1,000) units of Limo Touch systems per twelve (12) calendar months (with appropriate accounting done at the end of such

twelve (12) calendar months period).

(Pl's Ex. C., License Agreement.)  RNC maintains that MTG was required to pay royalties for the sale of Limo Touch products pursuant to the express terms of the License Agreement.

MTG argues that it did not owe any royalties for selling the Limo Touch technology by narrowly reading the definition of Licensed Technology in Section 1.5 to exclude the Limo Touch product because the Limo Touch software does not relate to the Multiplex Modular System Technology.  Section 1.5 states:

> 1.5. "Licensed Technology" means the RNC's proprietary electrical system relating to its Multiplex Modular System technology, including all Intel1ectual Property Rights inherent therein and appurtenant thereto and all associated Know-How, together with all Technology Updates provided to MTG hereunder and any Licensee Modifications to any of the foregoing.

(Pl's Ex. C., License Agreement.)  MTG argues that the Limo Touch product did not relate to the Multiplex system and does not contain intellectual property inherent or appurtenant to the Multiplex System.  Therefore, MTG argues that the Limo Touch product is not "Licensed Technology" under the License Agreement.

MTG further points to the deposition of Philip Franklin, president of RNC, and characterizes Franklin's testimony as an admission that MTG did not owe royalty payments for the use of RNC's "Limo Touch" technology. (Def.'s Ex. C, Deposition of Philip Franklin, ("Franklin Dep.") at 79:6-83:12).  The relevant portion of Franklin's deposition states:

Q. Would you agree with me that the license agreement is structured around the Multi-Plex or not?

* * *

A. It isn't. It is, in my mind, structured around the 9600 line [Limo Touch], the single-piece controller and the Multi-Plex controller.

Q. Do you know what it is that you licensed to Mr. Alpert? Mr. Alpert's company [MTG].

A. From a legal standpoint or in general?

Q. No - well, whatever standpoint you want.

A. The Limo Touch name, the look and feel.

Q. The Limo Touch name, look and feel? That's what you licensed?

A. Yes, of the passenger panel.

Q. And you didn't license Multi-Plex?

A. Again from a legal standpoint, I don't know if you can license something that doesn't exist.

Q. Well, we're in a lawsuit. So what we have to do with, unfortunately, is legal definitions.

A. Well, let me ask it this way: If it had been produced, then yes, it would have been covered by the agreement, absolutely.

Q. But because it never was produced, it's not part of the agreement?

A. I don't know from a legal standpoint. I'm not an attorney.

Q. Well, but what I'm asking you is, what did you think that you licensed? And you told me, the look, touch, feel - Limo Touch look, touch, feel.

A. If we're still not talking from a legal standpoint, then I think we did license the single-piece controller, the single control board, and the Multi-Plex system.

9

Q. Do you know for sure whether or not that's what you licensed?

A. I believe we did, yes.

Q. You believe that's what you did?

A. Yes.

Q. Why do you believe that?

A. Because it's spelled out in the agreement.

Q. Where?

A. But again -

Q. Show me. You got it. Show me.

A. 1.9 [of the License Agreement], I believe. A and B.

* * *

Q. It says [reading]: Licensed products means products also known as Limo Touch that incorporate, use or employ the licensed technology and that the manufacture, use, sale and the disposition of which would, with the licensed granted hereunder, infringe the intellectual property rights or know-how of in-license technology. Do you see that sentence?

A. Yes.

Q. Would you agree with me that 1.9 incorporates the definition of "licensed technology"?

A. Yes.

Q. Let's go up to Licensed Technology which is Paragraph 1.5.

A. Yeah.

Q. Licensed Technology [reading]: Means the RNC proprietary electrical system relating to its Multi-Plex modular system technology, including all intellectual property rights inherent herein and appurtenant thereto

10

and all associated know-how together with all technology updates provided to MTG hereunder and the licensed modifications to any of the foregoing.

 Do you see that?

A. Yes, I do.

Q. Does it say anywhere in 1.5, anything about the 9600, 96B,C, D, E, 9610 [products provided to or proposed to MTG], the look, touch, feel, does it anywhere mention the word Limo Touch?

A. It does not.

Q. Do you want to - so then now taking into consideration what we've read together, do you have any idea what it is that you licensed to Mr. Alpert?

A. We licensed RNC's proprietary electric system relating to its Multi-Plex modular system technology.

Q. Right.

A. Including all intellectual property rights inherent therein, et cetera, including the 9600A and B, which are certainly steps toward that Multi-Plex technology.

Q. But it does not say that in 1.5, does it?

A. No, it does not.

Q. See all I've got is the language. So I'm stuck with it and so are you.

A. Yes.

* * *

Q. Taking into consideration that 1.5 doesn't mention anything about Limo Touch or the 9600 series or anything else, is there anywhere else in this agreement that you could point to that would incorporate those designs in the definition of licensed technology?

A. License technology - again, not being an attorney, I would say no. I find it confusing between "licensed technology" and "licensed products."

11

Q. The answer is no?

A. The answer is no.

(Franklin Dep. at 78:22-83:13).

MTG characterizes this testimony as an unequivocal admission that RNC did not license the Limo Touch technology to MTG and therefore MTG does not owe RNC Royalty Payments.

In addition, Eric Alpert, the President of MTG, also testified in his deposition about the intention of the parties regarding the relationship between the Limo Touch technology and the Multi-Plex system in the License Agreement.  Specifically, Alpert stated:

> Well, I mean quite honestly, I believe it was always our intention to use the trademark Limo Touch for both product lines.  If you look at the agreement, it talks about the – the reference back to 1.9, the Limo Touch single controller system and all its developed control models, and then (b) the Multi-Plex control product.
> The Multi-Plex system would have been called Limo Touch also.  So, you know, I don't recall, you know, reading that exact section before we actually executed the agreement.  But it's safe to say that, you know, that's what it meant.

(Pl.'s Ex. E, Deposition of Eric Alpert ("Alpert Dep."), at 330:21-331:8).

Moreover, it is undisputed that MTG made royalty payments to RNC for the Limo Touch software from 2004 until September 2008. Sharon Ronchetti, Executive Vice President and Controller of MTG, testified in detail regarding the preparation of the royalty reports and MTG's compliance with paying royalties due.  In

12

particular, Ms. Ronchetti described Royalty Reports as:

> a compilation of all of the sales for Limo Touch products
> for the specific month, the amount of the sale as
> recorded or a credit is recorded and they [RNC] receive
> a percentage of the royalty from those products.

(Pl.'s Ex. D, Deposition of Sharon Ronchetti ("Ronchetti Dep."),
at 145:20-24.)  MTG began issuing royalty reports in 2004.
(Ronchetti Dep. 147:13-16.)  MTG paid royalties on Limo Touch
products until stopping in October 2008. (Ronchetti Dep. 156:22-
157:10.)  However, royalty reports continued to be issued monthly
and royalty payments were placed in an escrow account until 2009.
(Ronchetti Dep. 157:6-158:2.)

MTG argues that the Court should not consider its course of
dealing with RNC in interpreting the License Agreement.  MTG
contends in its sur-reply that RNC's course of dealing argument
raised in RNC's reply brief is belated and should have been
raised in RNC's complaint.

**B. Analysis**

Applying New Jersey law, a breach of contract claim requires
proof of three elements: (1) the existence of a valid contract;
(2) a breach of that contract; and (3) resulting damage to the
plaintiff.  Ramada Worldwide, Inc. v. Kim, No. 09-4534, 2010 WL
2879611 at *3 (D.N.J. July 15, 2010)(citing AT&T Credit Corp. v.
Zurich Data Corp., 37 F. Supp. 2d 367, 370 (D.N.J. 1999)).

It is undisputed that MTG has not paid royalties to RNC
since October 1, 2008.  It is also undisputed that MTG continued

to manufacture and sell the Limo Touch product from October 1, 2008 to at least February 1, 2011, as that is the date of the last royalty report submitted to RNC from MTG.  Further, MTG does not dispute that the License Agreement remained in full force and effect during this time period.[1]  Therefore, the first element of the existence of a valid contract and third element of damages are met.

The only issue remaining is whether MTG breached the License Agreement by failing to pay royalties to RNC after October 1, 2008.  The court must determine whether the License Agreement created a duty requiring MTG to pay royalties based on its sale of Limo Touch products.

MTG opposes RNC's motion for partial summary judgment by arguing that it did not owe any royalties for selling the Limo Touch technology pursuant to the terms of the License Agreement.  MTG maintains that the definition of "Licensed Technology" in Section 1.5 excludes the Limo Touch technology because the Limo Touch technology does not relate to the Multiplex Modular System Technology.  MTG relies on the deposition testimony of Philip Franklin, President of RNC, set forth at length above, to support this narrow interpretation of the License Agreement.  After carefully considering the submissions of the parties, the court

---

[1] Indeed, Count IV of MTG's Counterclaim seeks declaratory judgment that the Licensing Agreement "is in full force and effect."  [Docket Item 22.]

14

finds MTG's arguments unpersuasive.

When determining whether an ambiguity exists in a contract, the contract documents "must be read as a whole, without artificial emphasis on one section, with a consequent disregard for others." Borough of Princeton v. Board of Chosen Freeholders of County of Mercer, 333 N.J. Super. 310, 325 (N.J. App. Div. 2000). "[A]mbiguous language ought not be construed to extend the parties' rights and obligations beyond their common contemplation." Valley Hosp. v. Juliano, 280 N.J. Super. 517, 523 (App. Div. 1995). Moreover, the "court should examine the document as a whole and the court should not torture the language of a contract to create ambiguity." Societe Generale v. New Jersey Turnpike Authority, No. 03-2071, 2005 WL 1630838, *5 (D.N.J. July 11, 2005)(citing Schor v. FMS Financial corp., 357 N.J. Super. 185 (App. Div. 2002)). Furthermore, in determining whether an ambiguity exists, the court must consider extrinsic evidence as well as the contract language. Biovail Corp. Intern. v. Hoechst Aktiengesellschaft, 49 F. Supp. 2d 750, 774-75 (D.N.J. 1999). "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." Id. at 774.

In the instant case, the court will first look to the terms of the License Agreement to determine whether an ambiguity exists

regarding MTG's duty to pay royalties, beginning with the Royalty

Provision.  The License Agreement provides:

> 4.1. Royalty Payments. In consideration of the license
> rights granted by RNC to MTG hereunder, MTG shall pay to
> RNC for Licensed Products sold in the Territory within
> the Field. royalties of fifteen percent (15%) of Gross
> Revenues during each calendar month ("Royalties") payable
> within seven (7) business days after the end of such
> calendar month.

(License Agreement § 4.1.)  The contract clearly states that MTG

was required to pay royalties "for Licensed Products sold in the

Territory within the field."  <u>Id.</u>  In other words, the duty to

pay royalties was triggered by MTG's sale of the Licensed

Products.  The License Agreement defines "Licensed Products" as:

> 1.9. "Licensed Products" means products, also known as
> "Limo Touch", that incorporate, use or employ the
> Licensed Technology and that the manufacture, use, sale
> or other disposition of which would, but for the license
> granted hereunder infringe the Intellectual Property
> Rights or Know-How in Licensed Technology. The Parties
> agree that Licensed Products shall be limited to the
> following products:
> **(a) The existing RNC P9600 "Limo Touch" single-controller
> system and all it's developed control modules;** and
> (b) The Multiplex Controller Product currently under
> development, which is deemed by the Parties to be limited
> in scope to: (I) The Master Control Module; (ii) The
> Switched-Output Slave Modules; (iii) The HV AC (Fan)
> Slave Modules; (iv) The Audio-Video Power Slave Modules;
> and (v) Associated driver and passenger compartment
> control panels, whether based on capacitive sensing as
> the existing control panels in 1.9(a) above, or the
> anticipated graphics touch screen control panel products.

(License Agreement § 1.9)(emphasis added).  This provision

specifically includes "P9600 'Limo Touch' single-controller

system and all it's developed control modules" in the definition

16

of "Licensed Products."  Id.  Reading both of these provisions together, the License Agreement clearly and unambiguously states that MTG is required to pay royalties to RNC for the manufacture and sale of the Limo Touch product.

This conclusion is reinforced when viewed in conjunction with the extrinsic evidence presented by the parties, particularly MTG's compilation of Royalty Reports and payment of royalties[2] for the sale of Limo Touch products from 2004 to 2008. Indeed, Sharon Ronchetti, who prepared the royalty reports, defined them as:

> a compilation of all of the sales for Limo Touch products for the specific month, the amount of the sale as recorded or a credit is recorded and they [RNC] receive a percentage of the royalty from those products.

(Pl.'s Ex. D, Deposition of Sharon Ronchetti ("Ronchetti Dep."), at 145:20-24.)

The record is clear that royalty payments were based on the sale of Limo Touch products and were never measured or reduced because of the failed development of the Multi-Plex control product.

MTG's main argument is based on a narrow reading of Section 1.5 of the License Agreement.  Section 1.5 provides:

1.5. "Licensed Technology" means the RNC's proprietary

---

[2] MTG characterized these previous payments as "hope payments" instead of "royalty payments" at oral argument.  The court finds this characterization unpersuasive.

17

electrical system relating to its Multiplex Modular
System technology, including all Intel1ectual Property
Rights inherent therein and appurtenant thereto and all
associated Know-How, together with all Technology Updates
provided to MTG hereunder and any Licensee Modifications
to any of the foregoing.

(License Agreement § 1.5.)  While Section 1.5 is ambiguous as to
whether the 9600 Limo Touch series is considered "Licensed
Technology" under the agreement, the definition of "Licensed
Technology" is tangential to the issue of royalty payments.  As
discussed above, royalty payments were due for the sale of
Licensed Products under Section 4.1 and Licensed Products is
unambiguously defined to include the 9600 series Limo Touch
product pursuant to Section 1.9.

MTG's argument that the ambiguity created by Section 1.5
should be interpreted to absolve MTG of any duty to pay royalties
to RNC emphasizes one section of the contract and disregards more
pertinent sections of the License Agreement.  MTG's argument also
disregards evidence in the record regarding how royalty payments
were calculated and RNC's four year history of paying royalties
based on its sale of Limo Touch products.

MTG's reliance on the deposition of Phil Franklin is equally
unpersuasive.  MTG mischaracterizes Philip Franklin's testimony
as an unequivocal admission that MTG did not license the Limo
Touch technology to RNC and therefore maintains that MTG does not
owe RNC Royalty Payments.  Mr. Franklin first states that he
believed the "Limo Touch name, look and feel" were licensed to

18

MTG and testifies that the Limo Touch technology are "steps towards that Multi-Plex technology."

It is only when Mr. Franklin is confronted with specific questions regarding the isolated language of Section 1.5 that he states the Limo Touch technology is not included under the definition of License Technology.  In addition, Mr. Franklin admits that he found "it confusing between 'licensed technology' and 'licensed products'" and stated that "it (the License Agreement) is, in my mind, structured around the 9600 line (the Limo Touch technology), the single-piece controller and the Multi-Plex controller."

Moreover, it is clear from testimony of Eric Alpert, the president of MTG, that the Multi-Plex control product incorporated and stemmed from the Limo Touch technology.

The Court is unpersuaded by MTG's argument which "torture[s] the language of the contract to create ambiguity" where the specific terms of the License Agreement are clear.  <u>Societe Generale</u>, 2005 WL 1630838 at *5.  Accordingly, the court finds that the language of the License Agreement is unambiguous and imposes a duty on MTG to pay royalties for the sale of Limo Touch products.

MTG next argues that should the court find the language of the License Agreement to impose a duty to pay royalties, it still is not liable for such payments due to RNC's material breach of

the License Agreement.  MTG argues that RNC's material breach
excuses MTG's performance under the License Agreement to pay
royalties.  The court finds this argument lacks merit.

A material breach by either party to a bilateral contract
excuses the other party from rendering any further performance.
Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 285
(App. Div. 1998).  However, "[w]hen one party to a contract feels
that the other contracting party has breached its agreement, the
non-breaching party must either stop performance and assume the
contract as avoided, or continue its performance and sue for
damage.  Under no circumstances may the non-breaching party stop
performance *and* continue to take advantage of the contract's
benefits."  Travelodge Hotels, Inc. v. Honeysuckle Enterprises,
Inc., 357 F. Supp. 2d 788, 798 (D.N.J. 2005).  See also Jones v.
Marin, No. 07-0738, 2009 WL 2595619, *4 (D.N.J. Aug. 20,
2009)("even a material breach will not excuse performance if the
party continues to take advantage of the contract's benefits.").

In this case, MTG argues that RNC materially breached the
License Agreement by failing to develop the Multiplex System and
by providing a defective Limo Touch product.  Both of these
breaches allegedly occurred in 2004, shortly after the License
Agreement was executed.  However, MTG continued to sell the Limo
Touch product despite these alleged material breaches.  MTG even
continued to sell, manufacture and profit from the Limo Touch

20

product after this litigation was filed and the record indicates that MTG sold Limo Touch products until at least February 2011, when MTG generated the last royalty report, which remains unpaid. MTG cannot argue that it is excused from performance under the License Agreement because RNC materially breached the contract while simultaneously taking advantage of the contract's benefits by continuing to manufacture and sell Limo Touch products.

If MTG believed RNC had materially breach the agreement, it was obligated under New Jersey law to stop performance and void the contract once the breaches became apparent in 2004.  MTG chose to continue to perform under the contract.  New Jersey law is clear that MTG's remedy is to sue for damages, a remedy it is currently pursuing in its counterclaim and third party complaint. Accordingly, MTG's argument that RNC's material breach of the contract excused any obligation for MTG to pay royalties under the License Agreement is without merit, as MTG indisputably continued to reap the benefits of the License Agreement for seven years after these material breaches occurred.

Therefore, the court will grant RNC's motion for partial summary judgment as to the narrow issue of whether MTG was required to pay royalties to RNC for Limo Touch products. However, as genuine issues of material fact exist as to the

amount of royalties due,[3] the court will not award a specific amount of damages at this time.

## V.  RNC'S MOTION FOR SUMMARY JUDGMENT AS TO MTG'S COUNTERCLAIMS

The next motion for summary judgment was filed by RNC seeking to dismiss MTG's counterclaim and third party complaint. [Docket Item 94.]  First, RNC argues that MTG has no legal or factual basis for its unfair competition claims under the Lanham Act.  Next, RNC maintains that MTG has no legal or factual basis for its fraudulent inducement claims and argues that MTG waived any claim for fraudulent inducement; that MTG's claims for fraudulent inducement are barred by the New Jersey economic loss doctrine, the integration clause of the License Agreement and the Parol Evidence Rule; and that RNC's representations regarding future conduct are not a basis for a fraudulent inducement claim. Finally, RNC argues that RNC's purported breaches of the License Agreement do not give rise to the damages claimed by MTG.[4]

---

[3] MTG generated royalty reports from October 2008 until February 2011.  After February 2011, MTG ceased generating royalty reports even though MTG continued to sell Limo Touch products.  It is unclear from the record how many Limo Touch products were sold from March 2011 to the present and therefore, the amount of royalties due to RNC is uncertain.

[4] RNC does not address MTG's counterclaim for declaratory judgment finding the License Agreement remains in full force and effect.  In addition, MTG originally included a counterclaim for commercial disparagement against RNC.  This claim was subsequently dismissed with prejudice per the parties' stipulation.  [Docket Item 70.]

In response, MTG argues that summary judgment is inappropriate and there are genuine issues of material fact as to its counterclaims and third party complaint.  MTG maintains that its claim for fraudulent inducement is proper and is not barred by waiver or the License Agreement.  Further, MTG argues that RNC's misrepresentations are a sufficient basis for its fraudulent inducement claim.  Second, MTG argues that each area of damages sought by MTG is recoverable under a breach of contract theory.  MTG did not oppose RNC's motion for summary judgment as to its Lanham Act claims.

This opinion will first address summary judgment as to the Lanham Act claims and will then address whether summary judgment is appropriate as to the fraudulent inducement claim and breach of contract claim.

**A. Lanham Act Claims**

MTG's counterclaim and third party complaint allege that RNC and third-party defendants Phil Franklin and Eric Campos engaged in unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a).  Specifically, MTG alleges that as far back as April 2007, Phil Franklin made representations to MTG that he had designed a competing product or products to the Limo Touch system and MTG was not entitled to that technology. (Counterclaim ¶ 23.)  MTG alleged that RNC was shortly about to attempt to market and distribute this competing product.

23

(Counterclaim ¶ 24.)  MTG's pleading maintains that under the Licensing Agreement, MTG owns the rights to the technology used in the competing product and that RNC's deceptive actions infringe on MTG's licensed rights, and will likely cause consumer confusion within the relevant market and cause damages to MTG. (Counterclaim ¶¶ 26-28.)

Two items were produced in discovery regarding the competing product and alleged unfair competition.  First, Phil Franklin, president of RNC, testified that Light Emissive Design, Inc., a company in which Franklin and Eric Campos are involved, developed and, as of 2010, marketed a control system called "Smartcoach." Franklin testified that Smartcoach is a product intended to compete with Limo Touch, but does not use the Licensed Technology as encompassed in the License Agreement.  (Pl.'s Ex. R., Deposition of Philip Franklin, "Franklin Dep.," at 234-239.)  MTG has not examined or viewed the Smartcoach product.  (Pl's Ex. E, Alpert Dep. at 142.)

Second, an email from February 2008 was produced in discovery which included marketing material for an advertisement highlighting RNC's booth at the International LCT Show.  This marketing material states the RNC was the "1st . . . to Develop Limo Touch System." (Pl.'s Ex. Q.)  This email is alleged to be the basis of MTG's unfair competition claim that RNC wrongfully asserted ownership rights to the Limo Touch Technology in a trade

24

magazine advertisement.

In order to establish a claim under Section 43(a) of the Lanham Act, a plaintiff must show the following four elements: (1) ownership of a valid and legally protectable mark; (2) that defendant used the mark "in commerce" (3) "in connection with the sale, offering for sale, distribution, or advertising" of goods and services (4) in a manner likely to confuse customers.  800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F. Supp. 2d 273, 281-82 (D.N.J. 2006)(citing 15 U.S.C. § 1125(a) and Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 472 (3d Cir.1994)).

In this case, there is no evidence in the record that the Smartcoach product uses the Licensed Technology.  MTG has not examined or viewed the Smartcoach product during the course of this litigation and there is no expert report addressing the origins of the Smartcoach product.  There is also no evidence that RNC marketed the Smartcoach product by using the Limo Touch name.  The February 2008 advertisement was issued two years prior to the development of the Smartcoach product and contains a factually true statement - that RNC was the first to develop Limo Touch technology.  This is not disputed by MTG.  There is also no evidence of consumer confusion between the Limo Touch product and the Smart Couch product.  Therefore, MTG has failed to establish the elements of its Lanham act claims against RNC, Phil Franklin and Eric Campos.

In addition, MTG has not opposed the motion of RNC, Franklin and Campos for summary judgment as to this claim.  MTG has produced no evidence which presents a genuine issue of material fact for trial as to its Lanham Act claims.  MTG agreed that its Lanham Act claims should be dismissed at oral argument.

Therefore, summary judgment will be granted with regard to Count V of MTG's counterclaim against RNC and Count II of MTG's third party complaint against Philip Franklin and Eric Campos.

**B. Fraudulent Inducement**

MTG's counterclaim and third party complaint next allege that MTG was fraudulently induced by RNC, Philip Franklin and Eric Campos to enter into the License Agreement in 2003.  MTG alleges in its counterclaim that "RNC, through its agents, principals and employees, knowingly made material misrepresentations about its technology, as well as its ability to support said technology, as well as deliver the licensed technology at certain cost." (Counterclaim ¶ 7.)  MTG alleges RNC made these material misrepresentations in order to induce MTG to enter into the Licensing Agreement, and that MTG reasonably relied on these misrepresentations, which are known to be false, to its detriment and suffered damages.  (Counterclaim ¶¶ 8-9.)

In its opposition to this motion for summary judgment, MTG clarified that it relied on two specific representations made by RNC prior to entering into the License Agreement.  First, MTG

26

claims RNC misrepresented to MTG that it was developing numerous limousine-related products and the Multiplex System that did not require a traditional wiring harness.  MTG supports this argument by pointing to the deposition of Eric Alpert, the deposition of Bill Alden, and RNC's Systems, Inc. Projects List which was provided to MTG prior to signing the License Agreement.  (Def.'s Ex. D, Alpert Dep. 129:7-130:6; 280:18-281:3)(Def.'s Ex. F, Alden Dep. 7:19-8:10)(Def.'s Ex. E, RNC Project List).  The RNC Project List states at the beginning of the document: "Projects, (not necessarily in order, and not necessarily for certain)."  (Def.'s Ex. E, RNC Project List).

MTG argues that the court should not construe the line "not necessarily for certain" literally to mean that the future projects might not happen.  MTG maintains it was reasonable for it to rely on RNC's future project list as a guarantee that these projects would be successfully developed and marketed.  It is undisputed that the Multiplex System was never successfully developed despite it being listed on RNC's Project List.

Second, MTG argues that RNC made material representations prior to the signing of the License Agreement regarding its and MTG's ability to support its technology.  MTG relies on the deposition of MTG's Eric Alpert.  Alpert testified:

> Q: Other than issues related to promises associated with the Multi-Plex both as to delivery of the system to you for manufacture and other cost, and the document that you just referred there, what there other material

27

misrepresentations do you believe were made that induced
you to sign the contract?

A: That the product would be virtually flawless, that we
would be able to repair the product, that we would be
able to support the product with ease.  You know, they
made assertions that this transition and our ability to
be able to handle the manufacturing, sales, and support
of the product was going to be a no brainer for us.
     I can go through documents and find others, if you'd
like.

Q: No.  And all of this was done before the contract was
signed, correct?

A. Correct.

(Alpert Dep. 130:10-131:3.)

In reality, the Limo Touch product proved to be difficult to
support and ultimately caused several car fires.  The problems
with the Limo Touch technology were not resolved until 2007.  For
the purposes of this motion, RNC is not contesting that Limo
Touch was defective prior to fixes that occurred in 2007. (Pl.'s
Br. at 3.)

In order to establish a claim for fraudulent inducement,
five elements must be shown: (1) a material representation of a
presently existing or past fact; (2) made with knowledge of its
falsity; and (3) with the intention that the other party rely
thereon; (4) resulting in reliance by that party; (5) to his
detriment.  <u>Metex Mfg. Corp. v. Manson</u>, No. 05-2984, 2008 WL
877870, at *4 (D.N.J. March 28, 2008)(citing <u>Jewish Crt. of</u>
<u>Sussex County v. Whale</u>, 86 N.J. 619, 624 (1981)).

RNC challenges MTG's fraudulent inducement claim on several

28

grounds.  RNC argues (1) MTG waived its fraudulent inducement claim; (2) MTG's fraudulent inducement claims are barred by the New Jersey economic loss doctrine, the Integration Clause in the License Agreement and the parol evidence rule; and (3) MTG cannot establish the necessary elements of its fraudulent inducement claim.

After reviewing the parties' arguments and holding oral argument, the court finds MTG's fraudulent inducement claim should be dismissed pursuant to the New Jersey economic loss doctrine.  In addition, the court finds that the integration clause and parol evidence rule bar MTG's fraudulent inducement claim as well.

### 1. Economic Loss Doctrine

"The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract." Chen v. HD Dimension Corp., No. 10-863, 2010 WL 4721514, *8 (D.N.J. Nov. 15, 2010).  In particular, "whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." Id.  "Fraud claims can proceed alongside breach of contract claims where there exists fraud in the inducement of a contract or an analogous situation based on pre-contractual misrepresentations." Barton v. RCI, LLC, No. 10-3657, 2011 WL 3022238, *7 (D.N.J. July

22, 2011).  Specifically, "a plaintiff may be permitted to proceed with tort claims sounding fraud in the inducement so long as the underlying allegations involve misrepresentations unrelated to the performance of the contract, but rather precede the actual commencement of the agreement."  Chen, 2010 WL 4721514 at *8.

In this case, MTG's two alleged misrepresentations are directly related to RNC's performance under the License Agreement and form the basis of MTG's breach of contract claim.  First, MTG argues that RNC misrepresented that its new project, the Multiplex System, along with other projects, would be developed soon after the agreement.  The License Agreement specifically mentions the Multiplex System in its definition of "Licensed Products" and "Licensed Technology," and expressly states that the Multiplex System was "currently under development."[5]  In

---

[5] Sections 1.5 and 1.9 of the License Agreement state:
1.5. "Licensed Technology" means the RNC's proprietary electrical system relating to its Multiplex Modular System technology, including all Intellectual Property Rights inherent therein and appurtenant thereto and all associated Know-How, together with all Technology Updates provided to MTG hereunder and any Licensee Modifications to any of the foregoing.

1.9. "Licensed Products" means products, also known as "Limo Touch", that incorporate, use or employ the Licensed Technology and that the manufacture, use, sale or other disposition of which would, but for the license granted hereunder infringe the Intellectual Property Rights or Know-How in Licensed Technology. The Parties agree that Licensed Products shall be limited to the following products:
(a) The existing RNC P9600 "Limo Touch" single-controller system and all it's developed control modules; and

addition, the License Agreement addresses MTG's support responsibility for the Limo Touch product in Section 3.1 which states: "The Parties understand and agree that MTG shall be responsible for manufacturing, marketing, distributing, selling and supporting Licensed Products in the Territory within the Field using its best effort." (RNC's Ex. A.)  Finally, the License Agreement also addresses the parties' remedies in case the Licensed Technology was nonconforming or defective.  Section 5 states:

> In the event that more than five percent (5%) of Licensed Products sold during any given calendar month is returned to MTG due to Nonconformity, then MTG shall notify RNC immediately upon learning of such Nonconformity and RNC shall use commercially reasonable efforts to fix the Nonconformity or provide a workaround or other solution as soon as practicable.  If, for any reason, RNC fails to cure the Nonconformity or provide a workaround or other solution within thirty (30) days, MTG may terminate this Agreement subject to the termination provisions as provided under Section 14.

(Pl.'s Ex. A.)

Clearly, MTG's two purported misrepresentations are addressed squarely within the language of the License Agreement

---

(b) The Multiplex Controller Product **currently under development**, which is deemed by the Parties to be limited in scope to: (I) The Master Control Module; (ii) The Switched-Output Slave Modules; (iii) The HV AC (Fan) Slave Modules; (iv) The Audio-Video Power Slave Modules; and (v) Associated driver and passenger compartment control panels, whether based on capacitive sensing as the existing control panels in 1.9(a) above, or the anticipated graphics touch screen control panel products.

(RNC's Ex. A)(emphasis added).

31

and are not "unrelated to the performance of the contract" as required under the economic loss doctrine.

As further evidence that MTG's claims are not extrinsic to the License Agreement, MTG's breach of contract claim seeks the same damages as MTG's fraudulent inducement claim.  In particular, MTG seeks damages under breach of contract for having to continue to use technology with the traditional wiring harness which it would not have to do if the Multiplex System had been fully developed.  MTG also seeks damages in its breach of contract claim for the warranty and repair claims that were made as a result of the Limo Touch product malfunctioning and causing car fires.  The defective Limo Touch product, or here as MTG characterizes as RNC's misrepresentations about MTG's ability to support the Limo Touch product, clearly relate directly to RNC's performance under the License Agreement and MTG's remedy is more properly sought through its breach of contract claim.

Further, the court finds MTG's argument that the economic loss doctrine cannot apply to bar its fraudulent inducement claim without merit.  MTG relies heavily on Ocean Cape Hotel Corp. v. Mansefield Corp., 63 N.J. Super. 369 (App. Div. 1960), in support of its argument that a breach of contract claim and fraudulent inducement claim can proceed simultaneously as long as the

elements of fraudulent inducement are met.[6]  MTG's reliance is misplaced.

In Ocean Cape, the plaintiff leased hotel premises for a seven month period from the defendant.  Ocean Cape, 63 N.J. at 375.  Prior to signing the lease, the defendant told the plaintiff that the defects in the premises would be fixed well in advance of the vacation season, prior to Memorial Day.  Id.  The defects were not fixed until the first week in August.  Id.  The plaintiff alleged that it was fraudulently induced to enter the lease agreement based on the defendant's misrepresentations about the condition of the property.  Id. at 376.

The New Jersey Appellate Division held that the plaintiff could proceed with his fraudulent inducement claim, despite a provision in the lease agreement which averred that "no representation as to the physical condition of the property . . . have been made by the Lessor."  Id. at 377.  The court found that "a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parol evidence in an action based on fraud in the inducement to contract."  Id. at 377-78.  However, the

---

[6] MTG also stated in oral argument that it relied on Merchant's Indemnity Corp. v. Eggleston, 37 N.J. 114 (1962) in support of its argument that the economic loss doctrine should not bar MTG's fraudulent inducement claim.  Eggleston, however, did not address the New Jersey economic loss doctrine but rather discussed the issue of waiver of a fraudulent inducement claim. Therefore, this case is not applicable to the court's analysis.

Appellate Division expressly held "[t]he action at bar, however, is not grounded in contract, but in fraud." Id. at 382. Therefore, the plaintiff was permitted to allege his fraudulent inducement claim but had no viable claim for breach of contract.

This is clearly distinguishable from the instant case. Here, MTG's fraudulent inducement claim is in essence a breach of contract claim. MTG's two purported misrepresentations are addressed squarely within the language of the License Agreement and are intrinsic to RNC's performance under the contract and have the same measure of damages as MTG's breach of contract claim. Therefore, the New Jersey economic loss doctrine applies and MTG's reliance on Ocean Cape is unpersuasive.

Therefore, summary judgment will be granted dismissing MTG's fraudulent inducement claims against RNC, Philip Franklin and Eric Campos because these claims are barred under the New Jersey economic loss doctrine.

### 2. Integration Clause and Parol Evidence

In addition, the License Agreement's integration clause bars MTG's fraudulent inducement claim. The License Agreement provides:

> This Agreement constitutes the entire agreement between the Parties hereto with respect to subject matter hereof and thereof. This Agreement supersedes all prior or simultaneous representations, discussions, negotiations, letters, proposals, agreements and understandings between the Parties hereto with respect to the subject matter hereof and thereof, whether written or oral.

34

(RNC's Ex. A, §15.15.)

"It is manifestly unreasonable" for a party to rely on prior oral statements when the express language of the contract is written "explicitly nullifying any previous agreements, oral or written." Alexander v. CIGNA Corp., 991 F. Supp. 427, 436 (D.N.J. 1998).  This is especially true when the parties to the contract are "particularly experienced, knowledgeable business people." Id.

MTG argues that the Integration Clause and parol evidence rule should not bar the admission of RNC's prior misrepresentations because the language of the integration clause is boilerplate.  MTG cites to Travelodge Hotels Inc. v. Honeysuckle Enterprises, Inc., 357 F. Supp. 2d 788, 795 (D.N.J. 2005).  MTG relies on the following quoted language:

> It is well-settled that a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parol evidence in an action based on fraud in the inducement to contract ... while the parol evidence rule operates to prohibit the introduction of oral promises to alter or vary an integrated written instrument, parol proof of fraud in the inducement is not considered as either additional or substitutionary but rather as indicating that the instrument is, by reason of the fraud, void or voidable.

Id. at 795.  However, MTG fails to address the paragraph immediately following this section where the court notes:

> Of course, the parol evidence rule exception for claims of fraud is not without limits. New Jersey courts distinguish between "fraud regarding matters expressly addressed in the integrated writing and fraud regarding

35

matters wholly extraneous to the writing." <u>See</u> <u>Filmlife,</u>
<u>Inc. v. Mal "Z" Ena, Inc.</u>, 251 N.J.Super. 570, 598 A.2d
1234, 1236 (1991).  Stated another way:

> The alleged oral misrepresentations, being contradictory
> of the undertakings expressly dealt with by the writings,
> are not effectual in that circumstance to avoid the
> obligation he knowingly assumed. The general rule is
> clear that a parol agreement which is in terms
> contradictory of the express words of a contemporaneous
> or subsequent written contract, properly interpreted,
> necessarily is ineffectual and evidence of it
> inadmissible, whether the parol agreement be called
> collateral or not. <u>Id.</u>

<u>Id.</u> at 795-96.  <u>See</u> <u>also</u> <u>Chen v. HD Dimension Corp.</u>, No. 10-863,
2010 WL 4721514, *8 (D.N.J. 2010)(concluding that the "entire
agreement and understanding" provision of the agreement barred
any claims based on representations not included in the terms of
the contract where the complaint merely alleges the defendants
failed to perform their obligations under the agreement).

In this case, the misrepresentations claimed by MTG fall
within the ambit of the integration clause and should be barred.
Both misrepresentations were made to MTG prior to executing the
contract while the parties were negotiating the agreement.  As
discussed above, RNC's failure to successfully develop the
Multiplex System is in essence a breach of contract claim and not
a fraudulent inducement.  RNC's alleged misrepresentation
concerning MTG's ability to support the Limo Touch technology is
also addressed squarely within the express terms of the License
Agreement and any prior representation is superseded by the
Integration Clause.  Furthermore, both MTG and RNC are

sophisticated, corporate parties.  These alleged misrepresentations relate directly to the express terms of the License Agreement and should not be used to support a fraudulent inducement claim.

In addition, as a practical consideration, MTG's answer to RNC's fraudulent inducement claims asserted the License Agreement's integration clause as a defense to RNC's allegations and stated that the License Agreement's integration clause precluded use of any of the parties' pre-contract representations.  As MTG has not withdrawn this defense, it is inconsistent to enforce the integration clause against one party and conclude the same integration clause is unenforceable (and merely "legal boilerplate") as to the other.

The Court holds that these alleged misrepresentations are not "wholly extraneous to the writing" and relate to "matters expressly addressed in the integrated writing."  Travelodge Hotels, 357 F. Supp. 2d at 795.  Therefore, the misrepresentations are inadmissible under the Integration Clause and the parol evidence rule, and MTG's fraudulent inducement claims should be dismissed.

### 3. Conclusion

Summary judgment is appropriate and Count I of MTG's counterclaim against RNC and Count I of MTG's third party complaint against Philip Franklin and Eric Campos alleging

fraudulent inducement will be dismissed.  First, the New Jersey economic loss doctrine bars this type of fraud claim because MTG's claims are intrinsic to the performance of the License Agreement and therefore, MTG's rights to a remedy flow from contract, not tort.  Second, the Integration Clause and parol evidence rule bar admission of these pre-contractual representations.

Therefore, MTG's fraudulent inducement claims against RNC, Eric Campos and Philip Franklin will be dismissed.

### C. Breach of Contract Claim

MTG claims "due to RNC's failure to perform its obligations under the Licensing Agreement, MTG has suffered damages." (Counterclaim ¶ 12.)

A breach of contract claim requires proof of three elements: (1) the existence of a valid contract; (2) a breach of that contract; and (3) resulting damage to the plaintiff.  Ramada Worldwide, Inc. v. Steve Young Kim, No. 09-4534, 2010 WL 2879611 at *3 (D.N.J. July 15, 2010)(citing AT&T Credit Corp. v. Zurich Data Corp., 37 F. Supp. 2d 367, 370(D.N.J. 1999)).

For the purposes of this motion, RNC does not contest that there was a valid contract and that it breached its duties under the License Agreement by providing a defective Limo Touch product and failing to develop the Multiplex System.  However, RNC argues that the damages MTG seeks are not recoverable under the

contract.  MTG seeks four different types of damages:

> 1) Amounts Paid by MTG to buy the Mastrcon Technology and Hire Charles Dickens
>
> 2) Additional profits MTG would have earned if it had sold Limo Touch to Tiffany at full price, rather than the discounted price in the Tiffany/RNC Agreement
>
> 3) Full purchase price of each and every wiring harness MTG used in the manufacture of Limo Touch
>
> 4) Costs for warranty work to repair the defective Limo Touch units returned by MTG's customers

MTG's entitlement under a breach of contract theory to each of these damages will be addressed separately below.

### 1. Amounts Paid by MTG to buy the Mastrcon Technology and Hire Charles Dickens

As a result of RNC's breach of the License Agreement, MTG claims damages because it bought out the Mastrcon technology and hired Charles Dickens, the principal of Mastrcon, Inc. Specifically, MTG argues the License Agreement required MTG to discontinue the sale of Mastrcon and the only way to do that was to buy out Mastrcon, Inc.

RNC opposes this argument and maintains that MTG had no obligation to actually buy out Mastrcon, Inc., but could have simply ceased selling the Mastrcon technology.  In addition, RNC argues that is was not foreseeable at the time the License Agreement was executed that MTG would purchase Mastrcon and hire Dickens.  Indeed, under the License Agreement, MTG was required

39

to phase out the sale of Mastrcon within one year of executing the License Agreement.

A party may only recover damages for breach of contract if the damages would "reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it." Tousley v. Atlantic City Ambassador Hotel Corp., 50 A.2d 472, 474 (N.J. Sup. 1947).

In this case, there is an issue of fact with regard to the foreseeability of MTG's buy out of Mastrcon. In particular, Phil Franklin testified "[t]he only thing that I think gave us any hope that things would work out was that Ryan Weiss had said that MTG – not to worry, that MTG was going to bring over the people, the test equipment and the tools from Mastrcon to their factory." (MTG's Ex. H, Franklin Dep., 29:7-29:15.) Further, Franklin testified that he was with "Chuck Dickens [Mastrcon's principal], and it was explained that Mastrcon was going to be discontinued and that the Limo Touch was the new system." (Franklin Dep. 90:17-90:20.)

However, the License Agreement did not mention the buy out of Mastrcon and only required MTG to "discontinue the sale of the new Mastrcon Technology systems and replace it with the Licensed Products within the first twelve months of the License Agreement." (License Agreement ¶ 3.4.) It is undisputed that

MTG continues to sell and manufacture the Mastrcon technology to the present day.

Therefore, there is an issue of fact with whether it was reasonable for RNC to contemplate the buyout of Mastrcon as probable damages if the License Agreement was breached.  It is also unclear whether MTG paid more to purchase the Mastrcon technology because it intended to manufacture it long after the deadline agreed to in the License Agreement.

Therefore, summary judgment is inappropriate to dismiss this aspect of MTG's damages.

### 2.  Damages for Tiffany Sales

Prior to the License Agreement, RNC and Tiffany had an agreement that required RNC to sell Tiffany Limo Touch units at a discounted price of $200 over their cost of production in return for Tiffany providing RNC with funding and assistance in developing the Limo Touch technology.  This agreement was not disclosed to MTG prior to entering into the License Agreement nor does the License Agreement address any obligation MTG would have to continue selling Limo Touch products to Tiffany at $200 over cost.  However, after MTG was informed of this arrangement, MTG continued to offer Limo Touch products to Tiffany at the discounted rate.  MTG argues that it is entitled to damages for continuing to sell Limo Touch products to Tiffany at the

discounted price of $200 over cost instead of the higher market rate charged to MTG's other customers.

It is difficult to see how these damages are recoverable because they do not flow from RNC's breach of the License Agreement.  RNC breached the License Agreement by providing a defective Limo Touch product, failing to develop the Multiplex system and allegedly not properly supporting the Limo Touch product.  These events have nothing to do with MTG's decision to continue selling Limo Touch to Tiffany for the discounted price of $200 over cost.  While Tiffany was MTG's biggest customer, and RNC did not disclose its discount arrangement with Tiffany to MTG prior to executing the License Agreement, MTG is a sophisticated corporate party and made the decision to continue selling Limo Touch to Tiffany at a discounted price rather than lose Tiffany as a customer.  This was a voluntary, albeit difficult, business decision and is unrelated to RNC's breach of the License Agreement.

Therefore, these damages are not recoverable under MTG's breach of contract claim.

### 3. Cost of Traditional Wiring Harnesses

Next, MTG seeks to recover damages for the full purchase price of every traditional wiring harness MTG used in the manufacture of Limo Touch.  MTG argues that RNC's failure to develop the Multiplex System, a system that did not need a

42

traditional wiring harness, caused MTG to incur excess costs producing Limo Touch, a product that needs a traditional wiring harness.

There are issues of fact regarding this category of damages which prevent summary judgment.  First, Phil Franklin maintains that he never represented the Multiplex system would not require a wiring harness; rather, Franklin maintains that the Multiplex system would have a smaller wiring harness because there would be less wiring.  (Franklin Decl. ¶ 120.)  In contrast, Eric Alpert testified that RNC represented that the Multiplex system would not have a wiring harness at all.  (Alpert Dep. 280:18-281:3.)

The court finds the Licensing Agreement instructive. Section 3.6 of the License Agreement provides the parties' expectations regarding the cost to manufacture the Multiplex System.  Specifically, this section provides:

> The parties recognizes that manufacture of the basic minimal system of the multiplexed limousine controller product as shown in Subsection 1.9 is not intended to cost more than three hundred seventy five dollars ($375.00) in lots of 1,000 units, excluding labor.

(License Agreement § 3.6.)  While, the License Agreement is silent as to whether the Multiplex system would require a wiring harness, the License Agreement does specify the parties' expectations regarding the cost to manufacture the Multiplex System.  As MTG seeks damages for the cost of continuing to manufacture the Limo Touch product due to RNC's failure to

develop the Multiplex System, Section 3.6 of the License Agreement is particularly relevant.

While the exact cost savings of producing the hypothetical Multiplex harness versus the Limo Touch traditional harness are speculative, New Jersey law does not require precision when calculating damages.  A plaintiff need only establish a "foundation which will enable the trier of facts to make a fair and reasonable estimate." Caldwell v. Haynes, 643 A.2d 564, 571 (N.J. 1994)(citing Lane v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div. 1987)).

There are enough facts in the record to provide a foundation of the estimated production costs of the Mutliplex systems in comparison to the Limo Touch product.  However, MTG should not be permitted to recover the full purchase price of every traditional wiring harness MTG used in the manufacture of Limo Touch.  It is clear from the License Agreement that the parties estimated the cost of the Multiplex unit would be $375 in lots of 1,000 units excluding labor.  Consequently, MTG should be limited in its recovery to the cost of manufacturing the Limo Touch product which exceeded $375 in lots of 1,000 units excluding labor.

Therefore, summary judgment is inappropriate and MTG will be permitted to seek damages for its continued manufacturing cost of the Limo Touch product.  However, MTG will be limited to the cost of manufacturing the Limo Touch product which exceeded $375 in

44

lots of 1,000 units excluding labor, which was the parties'
intended manufacturing cost of the Multiplex system.

### 4. Limo Touch Warranty Expenses

For the purposes of this motion, RNC does not dispute that
the Limo Touch product was defective and caused several car fires
until it was repaired in 2007.  The License Agreement provides:

> In the event that more than five percent (5%) of Licensed
> Products sold during any given calendar month is returned
> to MTG due to Nonconformity, then MTG shall notify RNC
> immediately upon learning of such Nonconformity and RNC
> shall use commercially reasonable efforts to fix the
> Nonconformity or provide a workaround or other solution
> as soon as practicable.  If, for any reason, RNC fails to
> cure the Nonconformity or provide a workaround or other
> solution within thirty (30) days, MTG may terminate this
> Agreement subject to the termination provisions as
> provided under Section 14.

(License Agreement § 5.)

RNC argues that this provision is the exclusive remedy
agreed to by the parties for warranty claims resulting from
defective Limo Touch products.  RNC maintains this is the only
remedy available to MTG – MTG can terminate the agreement.  MTG
chose not to terminate the License Agreement but continued to
manufacture and sell Limo Touch, knowing of the defective
problems in the product.  Consequently, RNC contends MTG is
foreclosed from seeking money damages.

The issue before the court is whether this section of the
License Agreement can be read as the exclusive remedy agreed to
by the parties for defective Limo Touch products.  In this case,

this language cannot be read to foreclose MTG's right to damages. Specifically, there is no mention of exclusivity in the text.  In addition, the agreement expressly states "MTG **may** terminate this Agreement."  This is permissive language and a fair reading of this clause does not prohibit MTG from seeking damages.

Therefore, MTG is entitled to recover these damages under a breach of contract theory.

## IV.   CONCLUSION

For the reasons discussed herein, the court will grant RNC's motion for partial summary judgment regarding MTG's duty to pay royalties under the License Agreement.  However, the court will not award a specific amount of damages because genuine issues of fact exist as to the amount of royalty payments due and owing.

The court will grant in part and deny in part RNC's motion for summary judgment as to MTG's counterclaim and third party complaint.  Summary judgment will be granted as to MTG's claims alleging violations of the Lanham Act and fraudulent inducement. This results in the dismissal of MTG's third party complaint. Summary judgment will be denied as to MTG's claims alleging breach of contract.

The accompanying Order will be entered.


  **March 19, 2012**                    **s/ Jerome B. Simandle**
Date                               JEROME B. SIMANDLE
                                   Chief U.S. District Judge